# BOYDE *v.* CALIFORNIA

No. 88–6613.   Argued November 28, 1989—Decided March 5, 1990

REHNQUIST, C. J., delivered the opinion of the Court, in which WHITE, O'CONNOR, SCALIA, and KENNEDY, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which BRENNAN, J., joined, and in Parts I, II, III, and IV of which BLACKMUN and STEVENS, JJ., joined, *post*, p. 386.

*Dennis A. Fischer,* by appointment of the Court, 493 U. S. 952, argued the cause for petitioner. With him on the briefs was *John M. Bishop.*

*Frederick R. Millar, Jr.,* Supervising Deputy Attorney General of California, argued the cause for respondent. With him on the brief were *John K. Van de Kamp,* Attorney General, *Richard B. Iglehart,* Chief Assistant Attorney General, *Harley D. Mayfield,* Senior Assistant Attorney General, and *Jay M. Bloom,* Supervising Deputy Attorney General.*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

This case requires us to decide whether two California jury instructions used in the penalty phase of petitioner's capital murder trial and in other California capital cases before each was modified in 1983 and 1985, respectively, are consistent with the requirements of the Eighth Amendment. We hold that they are.

Petitioner Richard Boyde was found guilty by a jury in the robbery, kidnaping, and murder of Dickie Gibson, the night clerk at a 7-Eleven Store in Riverside, California. The State introduced evidence at trial that about 2:30 a.m. on January 15, 1981, Boyde entered the store and robbed the clerk at gunpoint of $33 from the cash register. Petitioner then

---

*Briefs of *amici curiae* urging affirmance were filed for the State of Arizona et al. by *Robert K. Corbin,* Attorney General of Arizona, *Paul J. McMurdie,* Assistant Attorney General, and *Jessica Gifford Funkhauser,* and joined by the Attorneys General for their respective States as follows: *Donald Siegelman* of Alabama, *William L. Webster* of Missouri, *Marc Racicot* of Montana, *Lacy H. Thornburg* of North Carolina, *Anthony J. Celebrezze, Jr.,* of Ohio, *Ernest D. Preate, Jr.,* of Pennsylvania, and *Joseph B. Meyer* of Wyoming; and for the Criminal Justice Legal Foundation by *Kent S. Scheidegger* and *Charles L. Hobson.*

*Richard C. Neuhoff* and *Eric S. Multhaup* filed a brief for the California Appellate Project as *amicus curiae.*

forced Gibson into a waiting car, which was driven by petitioner's nephew, and the three men drove to a nearby orange grove.  There, Boyde brought Gibson into the grove and ordered him to kneel down with his hands behind his head.  As Gibson begged for his life, Boyde shot him once in the back of the head and again in the forehead, killing him.  The jury returned a special verdict that Boyde personally committed the homicide with "express malice aforethought and premeditation and deliberation."

At the penalty phase of the trial, the jury was instructed, *inter alia*, in accordance with instructions 8.84.1 and 8.84.2, 1 California Jury Instructions, Criminal (4th ed. 1979) (CALJIC), both of which have since been amended.  The former lists 11 factors that the jury "shall consider, take into account and be guided by" in determining whether to impose a sentence of death or life imprisonment.[1]  The eleventh is a

---

[1] The complete instruction provides:

"In determining which penalty is to be imposed on [each] defendant, you shall consider all of the evidence which has been received during any part of the trial of this case, [except as you may be hereafter instructed].  You shall consider, take into account and be guided by the following factors, if applicable:

"(a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstance[s] found to be true.

"(b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the expressed or implied threat to use force or violence.

"(c) The presence or absence of any prior felony conviction.

"(d) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

"(e) Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.

"(f) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct.

"(g) Whether or not the defendant acted under extreme duress or under the substantial domination of another person.

"(h) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to

"catch-all," factor (k), which reads: "Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime."[2]  The court's concluding instruction, pursuant to CALJIC 8.84.2, again told the jury to consider all applicable aggravating and mitigating circumstances and followed with this direction: "If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you *shall impose* a sentence of death.  However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you *shall impose* a sentence of confinement in the state prison for life without the possibility of parole."  (Emphasis added.)[3]  After hear-

---

the requirements of law was impaired as a result of mental disease or defect or the affects of intoxication.

"(i)  The age of the defendant at the time of the crime.

"(j)  Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.

"(k)  Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime."

[2] In *People* v. *Easley*, 34 Cal. 3d 858, 671 P. 2d 813 (1983), the Supreme Court of California stated that in order to avoid potential misunderstanding over the meaning of factor (k) in the future, trial courts "should inform the jury that it may consider as a mitigating factor 'any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime' and any other 'aspect of [the] defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death.'"  *Id.*, at 878, n. 10, 671 P. 2d, at 826, n. 10 (quoting *Lockett* v. *Ohio*, 438 U. S. 586, 604 (1978) (plurality opinion)).  CALJIC 8.84.1 has since been formally amended and the present factor (k) instruction directs the jury to consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime [and any sympathetic or other aspect of the defendant's character or record [that the defendant offers] as a basis for a sentence less than death, whether or not related to the offense for which he is on trial . . .]."  1 California Jury Instructions, Criminal 8.85(k) (5th ed. 1988).

[3] In *People* v. *Brown*, 40 Cal. 3d 512, 726 P. 2d 516 (1986), the Supreme Court of California acknowledged that the "shall impose" language of instruction 8.84.2 "le[ft] room for some confusion as to the jury's role."  *Id.*, at 544, n. 17, 726 P. 2d, at 534, n. 17.  The court believed that the Eighth and Fourteenth Amendments required that the jury have the discretion to

ing six days of testimony concerning the appropriate penalty, the jury returned a verdict imposing the sentence of death, and the trial court denied Boyde's motion to reduce the sentence.

On appeal, the Supreme Court of California affirmed. 46 Cal. 3d 212, 758 P. 2d 25 (1988). It rejected petitioner's contention that the jury instructions violated the Eighth Amendment because the so-called "unadorned version" of factor (k) did not allow the jury to consider mitigating evidence of his background and character. The court noted that all of the defense evidence at the penalty phase related to Boyde's background and character, that the jury was instructed to consider "'all of the evidence which has been received during any part of the trial of this case,'" and that the prosecutor "never suggested that the background and character evidence could not be considered." *Id.*, at 251, 758 P. 2d, at 47. Therefore, the court found it "inconceivable the jury would have believed that, though it was permitted to hear defend-

---

decide whether, under all of the relevant circumstances, a defendant deserves the punishment of death or life without parole, *id.*, at 540, 726 P. 2d, at 531, and stated that each case in which the mandatory language was used "must be examined on its own merits to determine whether, in context, the sentencer may have been misled to defendant's prejudice about the scope of its sentencing discretion under the 1978 law." *Id.*, at 544, n. 17, 726 P. 2d, at 534, n. 17. The court noted that a proposed instruction, which has since been adopted almost verbatim, see 1 CALJIC 8.88 (5th ed. 1988), would conform to its opinion: "'The weighing of aggravating and mitigating circumstances does not mean a mere mechanical weighing of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. In weighing the various circumstances you simply determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances. To return a judgment of death, each of you must be persuaded that the aggravating evidence [circumstances] is so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole.'" 40 Cal. 3d, at 545, n. 19, 726 P. 2d, at 535, n. 19.

ant's background and character evidence and his attorney's lengthy argument concerning that evidence, it could not consider that evidence." *Ibid.*

With regard to the "shall impose" language of CALJIC 8.84.2, the court agreed with petitioner that the instruction could not permissibly require a juror to vote for the death penalty "'unless, upon completion of the "weighing" process, he decides that death is the appropriate penalty under all the circumstances.'" 46 Cal. 3d, at 253, 758 P. 2d, at 48 (quoting *People* v. *Brown,* 40 Cal. 3d 512, 541, 726 P. 2d 516, 532 (1985)). It concluded, however, that in this case "[t]he jury was adequately informed as to its discretion in determining whether death was the appropriate penalty." 46 Cal. 3d, at 253, 758 P. 2d, at 48. Three justices dissented from the court's affirmance of the death sentence. The dissenters argued that the mandatory feature of instruction 8.84.2 misled the jury into believing that it was required to impose the death penalty if the aggravating factors "outweighed" the mitigating factors, even though an individual juror might not have thought death was the appropriate penalty in this case. *Id.,* at 257–266, 758 P. 2d, at 51–57. We granted certiorari, 490 U. S. 1097 (1989), and now affirm.

Petitioner reiterates in this Court his argument that the mandatory nature of former CALJIC 8.84.2 resulted in a sentencing proceeding that violated the Eighth Amendment, because the instruction prevented the jury from making an "individualized assessment of the appropriateness of the death penalty." See *Penry* v. *Lynaugh,* 492 U. S. 302, 319 (1989). Specifically, Boyde contends that the "shall impose" language of the jury instruction precluded the jury from evaluating the "absolute weight" of the aggravating circumstances and determining whether they justified the death penalty. He further asserts that the jury was prevented from deciding whether, in light of all the aggravating and mitigating evidence, death was the appropriate penalty. In response, the State argues that the sentencing proceeding was consistent

with the Eighth Amendment, because a reasonable juror would interpret the instruction as allowing for the exercise of discretion and moral judgment about the appropriate penalty in the process of weighing the aggravating and mitigating circumstances.

We need not discuss petitioner's claim at length, because we conclude that it is foreclosed by our decision earlier this Term in *Blystone* v. *Pennsylvania, ante,* p. 299. In *Blystone,* we rejected a challenge to an instruction with similar mandatory language, holding that "[t]he requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence." *Ante,* at 307. Although Blystone, unlike Boyde, did not present any mitigating evidence at the penalty phase of his capital trial, the legal principle we expounded in *Blystone* clearly requires rejection of Boyde's claim as well, because the mandatory language of CALJIC 8.84.2 is not alleged to have interfered with the consideration of mitigating evidence. Petitioner suggests that the jury must have freedom to decline to impose the death penalty even if the jury decides that the aggravating circumstances "outweigh" the mitigating circumstances. But there is no such constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence "in an effort to achieve a more rational and equitable administration of the death penalty." *Franklin* v. *Lynaugh,* 487 U. S. 164, 181 (1988) (plurality opinion). Petitioner's claim that the "shall impose" language of CALJIC 8.84.2 unconstitutionally prevents "individualized assessment" by the jury is thus without merit.

The second issue in this case is whether petitioner's capital sentencing proceedings violated the Eighth Amendment because the trial court instructed the jury in accordance with former CALJIC 8.84.1, including the "unadorned" factor (k). The Eighth Amendment requires that the jury be able to consider and give effect to all relevant mitigating evidence

offered by petitioner. See *Lockett* v. *Ohio*, 438 U. S. 586 (1978); *Eddings* v. *Oklahoma*, 455 U. S. 104 (1982); *Penry*, *supra.* In assessing the effect of a challenged jury instruction, we follow the familiar rule stated in *Cupp* v. *Naughten*, 414 U. S. 141 (1973):

> "In determining the effect of this instruction on the validity of respondent's conviction, we accept at the outset the well-established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge. *Boyd* v. *United States*, 271 U. S. 104, 107 (1926)." *Id.*, at 146–147.

Petitioner contends that none of the 11 statutory factors in CALJIC 8.84.1 allowed the jury to consider non-crime-related factors, such as his background and character, which might provide a basis for a sentence less than death. Nine of the factors, he argues, focused only on the immediate circumstances of the crime itself. Two others, factors (b) and (c), which center on the presence or absence of prior violent criminal activity and prior felony convictions, were in petitioner's view simply vehicles for the consideration of aggravating evidence not directly related to the crime. Finally, petitioner claims that the "catchall" factor (k) did not allow the jury to consider and give effect to non-crime-related mitigating evidence, because its language—"[a]ny other circumstance which extenuates the gravity of the crime"—limited the jury to other evidence that was *related to the crime.*

The legal standard for reviewing jury instructions claimed to restrict impermissibly a jury's consideration of relevant evidence is less than clear from our cases. In *Francis* v. *Franklin*, 471 U. S. 307 (1985), we said that "[t]he question . . . is : . . . what a reasonable juror *could have understood* the charge as meaning." *Id.*, at 315–316 (emphasis added). See also *Sandstrom* v. *Montana*, 442 U. S. 510, 516–517 (1979). But our subsequent decisions, while sometimes purporting

to apply the *Francis* standard, have not adhered strictly to that formulation. In *California* v. *Brown*, 479 U. S. 538, 541–542 (1987), we made reference both to what a reasonable juror *"could"* have done and what he *"would"* have done. And two Terms ago in *Mills* v. *Maryland*, 486 U. S. 367 (1988), we alluded to at least three different inquiries for evaluating such a challenge: whether reasonable jurors *"could have"* drawn an impermissible interpretation from the trial court's instructions, *id.*, at 375–376 (emphasis added); whether there is a *"substantial possibility* that the jury may have rested its verdict on the 'improper' ground," *id.*, at 377 (emphasis added); and how reasonable jurors *"would have"* applied and understood the instructions. *Id.*, at 389 (WHITE, J., concurring) (emphasis added). Other opinions in the area likewise have produced a variety of tests and standards. See, *e. g.*, *Penry* v. *Lynaugh*, 492 U. S., at 326 ("[A] reasonable juror *could well have believed* that there was no vehicle for expressing the view that Penry did not deserve to be sentenced to death based upon his mitigating evidence") (emphasis added); *Franklin* v. *Lynaugh*, *supra*, at 192 (STEVENS, J., dissenting) ("[N]either of the Special Issues as they *would have been understood by reasonable jurors* gave the jury the opportunity to consider petitioner's mitigating evidence") (emphasis added); see also *Andres* v. *United States*, 333 U. S. 740, 752 (1948) ("That reasonable men might derive a meaning from the instructions given other than the proper meaning . . . *is probable"*) (emphasis added).

Although there may not be great differences among these various phrasings, it is important to settle upon a single formulation for this Court and other courts to employ in deciding this kind of federal question. Our cases, understandably, do not provide a single standard for determining whether various claimed errors in instructing a jury require reversal of a conviction. In some instances, to be sure, we have held that "when a case is submitted to the jury on alter-

native theories the unconstitutionality of any of the theories requires that the conviction be set aside. See, *e. g.*, *Stromberg* v. *California*, 283 U. S. 359 (1931)." *Leary* v. *United States*, 395 U. S. 6, 31–32 (1969); see also *Bachellar* v. *Maryland*, 397 U. S. 564, 571 (1970). In those cases, a jury is clearly instructed by the court that it may convict a defendant on an impermissible legal theory, as well as on a proper theory or theories. Although it is possible that the guilty verdict may have had a proper basis, "it is equally likely that the verdict . . . rested on an unconstitutional ground," *Bachellar, supra*, at 571, and we have declined to choose between two such likely possibilities.

In this case we are presented with a single jury instruction. The instruction is not concededly erroneous, nor found so by a court, as was the case in *Stromberg* v. *California*, 283 U. S. 359 (1931). The claim is that the instruction is ambiguous and therefore subject to an erroneous interpretation. We think the proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence. Although a defendant need not establish that the jury was more likely than not to have been impermissibly inhibited by the instruction, a capital sentencing proceeding is not inconsistent with the Eighth Amendment if there is only a possibility of such an inhibition. This "reasonable likelihood" standard, we think, better accommodates the concerns of finality and accuracy than does a standard which makes the inquiry dependent on how a single hypothetical "reasonable" juror could or might have interpreted the instruction. There is, of course, a strong policy in favor of accurate determination of the appropriate sentence in a capital case, but there is an equally strong policy against retrials years after the first trial where the claimed error amounts to no more than speculation.[4] Jurors do not sit in

---

[4] In other contexts, we have held that a defendant cannot establish a constitutional violation simply by demonstrating that an alleged trial-

solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.

Applying this standard to factor (k) of CALJIC 8.84.1 standing alone, we think there is not a reasonable likelihood that Boyde's jurors interpreted the trial court's instructions to prevent consideration of mitigating evidence of background and character. The jury was instructed, according to factor (k), that "you shall consider . . . [a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime," and the term "extenuate" was defined by the court to mean "to lessen the seriousness of a crime as by giving an excuse." App. 34. Petitioner contends that this instruction did not permit the jury to give effect to evidence—presented by psychologists, family, and friends—of his impoverished and deprived childhood, his inadequacies as a school student, and his strength of character in the face of these obstacles. But as we explained last

related error could or might have affected the jury. To establish that ineffective assistance of counsel violates the Sixth Amendment, for example, a defendant must show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland* v. *Washington*, 466 U. S. 668, 694 (1984). Deportation of potential defense witnesses does not violate due process unless "there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact." *United States* v. *Valenzuela-Bernal*, 458 U. S. 858, 874 (1982). And failure of the prosecution to disclose allegedly exculpatory evidence to the defense violates due process "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States* v. *Bagley*, 473 U. S. 667, 682 (1985). To receive a new trial based on newly discovered evidence, a defendant must demonstrate that the evidence would more likely than not lead to a different outcome. See *INS* v. *Abudu*, 485 U. S. 94, 107, n. 12 (1988).

Term in *Penry* v. *Lynaugh:* "'evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, *may be less culpable than defendants who have no such excuse.*'" 492 U. S., at 319 (quoting *California* v. *Brown*, 479 U. S., at 545 (O'CONNOR, J., concurring)) (emphasis added). Petitioner had an opportunity through factor (k) to argue that his background and character "extenuated" or "excused" the seriousness of the crime, and we see no reason to believe that reasonable jurors would resist the view, "long held by society," that in an appropriate case such evidence would counsel imposition of a sentence less than death. The instruction did not, as petitioner seems to suggest, limit the jury's consideration to "any other circumstance *of the crime* which extenuates the gravity of the crime." The jury was directed to consider *any other circumstance* that might excuse the crime, which certainly includes a defendant's background and character.[5]

---

[5] The dissent focuses on the terms "gravity" and "seriousness" and argues that background and character evidence has no effect on the seriousness of the crime. But the jury was instructed to consider any circumstance which "*extenuates* the gravity of the crime even though it is not a legal excuse for the crime" or "lessens the seriousness of a crime *as by giving an excuse.*" The instruction directs the jury to consider "any other circumstance" which might provide such an excuse, and we think jurors would naturally consider background and character as a possible excuse.

At oral argument (though not in his brief), counsel for petitioner also argued that testimony that Boyde won a prize for his dance choreography while in prison showed that he could lead a useful life behind bars, and that the jury must be able to consider that evidence as a mitigating circumstance under our decision in *Skipper* v. *South Carolina*, 476 U. S. 1 (1986). Factor (k), he argued, did not allow for such consideration. In *Skipper*, we held that a capital defendant must be permitted to introduce in mitigation evidence of postcrime good prison behavior to show that he would not pose a danger to the prison community if sentenced to life imprisonment rather than death. The testimony that petitioner had won a dance contest

Even were the language of the instruction less clear than we think, the context of the proceedings would have led reasonable jurors to believe that evidence of petitioner's background and character could be considered in mitigation. Other factors listed in CALJIC 8.84.1 allow for consideration of mitigating evidence not associated with the crime itself, such as the absence of prior criminal activity by a defendant, the absence of prior felony convictions, and youth. When factor (k) is viewed together with those instructions, it seems even more improbable that jurors would arrive at an interpretation that precludes consideration of all non-crime-related evidence.

All of the defense evidence presented at the penalty phase— four days of testimony consuming over 400 pages of trial transcript—related to petitioner's background and character, and we think it unlikely that reasonable jurors would believe the court's instructions transformed all of this "favorable testimony into a virtual charade." *California* v. *Brown*, *supra*, at 542. The jury was instructed that it "*shall consider all of the evidence* which has been received during any part of the trial of this case," App. 33 (emphasis added), and in our view reasonable jurors surely would not have felt constrained by the factor (k) instruction to *ignore all* of the evi-

---

while in prison, however, was introduced not to demonstrate that he was a "model prisoner" like Skipper and therefore unlikely to present a risk of future dangerousness, but to show that he had artistic ability. Tr. 4607–4608. Moreover, although the record is not clear on this point, petitioner apparently won the dance prize during a prison term served *prior* to the Gibson murder, and the evidence thus did not pertain to prison behavior after the crime for which he was sentenced to death, as was the case in *Skipper*. The testimony about dancing ability was presented as part of petitioner's overall strategy to portray himself as less culpable than other defendants due to his disadvantaged background and his character strengths in the face of those difficulties. As with other evidence of good character, therefore, the jury had the opportunity to conclude through factor (k) that petitioner's dancing ability extenuated the gravity of the crime because it showed that Boyde's criminal conduct was an aberration from otherwise good character.

dence presented by petitioner during the sentencing phase. Presentation of mitigating evidence alone, of course, does not guarantee that a jury will feel entitled to consider that evidence. But the introduction without objection of volumes of mitigating evidence certainly is relevant to deciding how a jury would understand an instruction which is at worst ambiguous. This case is unlike those instances where we have found broad descriptions of the evidence to be considered insufficient to cure statutes or instructions which clearly directed the sentencer to disregard evidence. See, *e. g.*, *Hitchcock* v. *Dugger*, 481 U. S. 393, 398–399 (1987) ("[I]t could not be clearer that the advisory jury was instructed not to consider, and the sentencing judge refused to consider, evidence of nonstatutory mitigating circumstances . . ."); *Lockett*, 438 U. S., at 608 (plurality opinion) (Even under Ohio's "liberal" construction of the death penalty statute, "only the three factors specified in the statute can be considered in mitigation of the defendant's sentence").

Petitioner also asserts that arguments by the prosecutor immediately before the jury's sentencing deliberations reinforced an impermissible interpretation of factor (k) and made it likely that jurors would arrive at such an understanding. But arguments of counsel generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence, see Tr. 3933, and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law. See *Carter* v. *Kentucky*, 450 U. S. 288, 302–304, and n. 20 (1981); *Quercia* v. *United States*, 289 U. S. 466, 470 (1933); *Starr* v. *United States*, 153 U. S. 614, 626 (1894). Arguments of counsel which misstate the law are subject to objection and to correction by the court. *E. g.*, *Greer* v. *Miller*, 483 U. S. 756, 765–766, and n. 8 (1987). This is not to say that prosecutorial misrepresentations may never have a decisive effect on the jury, but only that they are not to be judged as

having the same force as an instruction from the court. And the arguments of counsel, like the instructions of the court, must be judged in the context in which they are made. *Greer, supra,* at 766; *Darden* v. *Wainwright,* 477 U. S. 168, 179 (1986); *United States* v. *Young,* 470 U. S. 1, 11–12 (1985); see also *Donnelly* v. *DeChristoforo,* 416 U. S. 637, 647 (1974) ("[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations").

We find no objectionable prosecutorial argument in this case. Petitioner maintains that the prosecutor encouraged an intolerably narrow view of factor (k) when he argued to the jury that the mitigating evidence did not "suggest that [petitioner's] crime is less serious or that the gravity of the crime is any less," App. 24, and that "[n]othing I have heard lessens the seriousness of this crime." *Id.,* at 29. But we agree with the Supreme Court of California, which was without dissent on this point, that "[a]lthough the prosecutor argued that in his view the evidence did not sufficiently mitigate Boyde's conduct, he never suggested that the background and character evidence could not be considered." 46 Cal. 3d, at 251, 758 P. 2d, at 47. His principal tack was not to contend that background and character were irrelevant, but to urge the jury that despite petitioner's past difficulties, he must accept responsibility for his actions. See App. 28–30. Indeed, the prosecutor explicitly assumed that petitioner's character evidence was a proper factor in the weighing process, but argued that it was minimal in relation to the aggravating circumstances:

> "The Defendant can dance. The Defendant . . . may have some artistic talent. The Defendant may, in fact, have been good with children. During the course of twenty-four years, even on a basis of just random luck, you are going to have to have picked up something or

> done something . . . we can all approve of, *but if you consider that on the weight that goes against it, . . . it is not even close.*"   Tr. 4820–4821 (emphasis added).

·Defense counsel also stressed a broad reading of factor (k) in his argument to the jury: "[I]t is almost a catchall phrase. Any other circumstance, and it means just that, any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse."   App. 31.[6]

In sum, we conclude there is not a reasonable likelihood that the jurors in petitioner's case understood the challenged instructions to preclude consideration of relevant mitigating evidence offered by petitioner.   We thus hold that the giving of the jury instructions at issue in this case, former CALJIC 8.84.1 and 8.84.2, did not violate the Eighth and Fourteenth Amendments to the United States Constitution.   The judgment of the Supreme Court of California is

*Affirmed.*

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, and with whom JUSTICE BLACKMUN and JUSTICE STEVENS join as to Parts I, II, III, and IV, dissenting.

It is a bedrock principle of our capital punishment jurisprudence that, in deciding whether to impose a sentence of death, a sentencer must consider not only the nature of the offense but also the "'character and propensities of the of-

---

[6] We find no merit to the contention of petitioner and *amicus* that arguments of prosecutors in *other* California cases bear on the validity of the factor (k) instruction in this case.   Petitioner's jury obviously was not influenced by comments made in other California capital trials.   Nor do we think the fact that prosecutors in other cases may have pressed a construction of factor (k) that would cause the sentencing proceedings to violate the Eighth Amendment means that reasonable jurors are likely to have arrived at an such an interpretation.   Prosecutors are interested advocates, and the arguments that one or more prosecutors may have made in urging a particular construction of factor (k) in other cases is not a weighty factor in deciding whether the jury in petitioner's case would have felt precluded from considering mitigating evidence.

fender.'"   *Woodson* v. *North Carolina*, 428 U. S. 280, 304
(1976) (plurality opinion) (quoting *Pennsylvania ex rel. Sulli-
van* v. *Ashe*, 302 U. S. 51, 55 (1937)); see also *ante*, at
381–382.   Without question, our commitment to individual-
ized sentencing in capital proceedings provides some hope
that we can avoid administering the death penalty "discrimi-
natorily, wantonly and freakishly."   *Gregg* v. *Georgia* 428
U. S. 153, 220–221 (1976) (WHITE, J., concurring in judg-
ment) (footnotes omitted).   The insistence in our law that
the sentencer know and consider the defendant as a human
being before deciding whether to impose the ultimate sanc-
tion operates as a shield against arbitrary execution and
enforces our abiding judgment that an offender's circum-
stances, apart from his crime, are relevant to his appropriate
punishment.

The Court holds today that Richard Boyde's death sen-
tence must be affirmed even if his sentencing jury reasonably
could have believed that it could not consider mitigating evi-
dence regarding his character and background.   Eschewing
the fundamental principle that "the risk that the death pen-
alty will be imposed in spite of factors which may call for a
less severe penalty . . . is unacceptable and incompatible
with the commands of the Eighth and Fourteenth Amend-
ments," *Lockett* v. *Ohio*, 438 U. S. 586, 605 (1978), the Court
adopts an unduly stringent standard for reviewing a chal-
lenge to a sentencing instruction alleged to be constitution-
ally deficient.   Under the majority's approach, a capital sen-
tence will stand unless "there is a reasonable likelihood that
the jury has applied the challenged instruction" unconstitu-
tionally.   *Ante*, at 380.   Because the majority's "reasonable
likelihood" standard is not met where a "'reasonable' juror
could or might have interpreted" a challenged instruction un-
constitutionally, *ibid.* that standard is inconsistent with our
longstanding focus, in reviewing challenged instructions in all
criminal contexts, on whether a juror *could* reasonably inter-
pret the instructions in an unconstitutional manner.   See.

*e. g., Sandstrom* v. *Montana,* 442 U. S. 510 (1979). Even more striking, the majority first adopts this standard in its review of a capital sentencing instruction. I have long shared this Court's assessment that death is qualitatively different from all other punishments, see *Spaziano* v. *Florida,* 468 U. S. 447, 468, and n. 2 (1984) (STEVENS, J., concurring in part and dissenting in part) (collecting cases), but I have never understood this principle to mean that we should review death verdicts with less solicitude than other criminal judgments. By adopting its unprecedented standard, the majority places too much of the risk of error in capital sentencing on the defendant.

Further, the majority's conclusion that "there is not a reasonable likelihood that the jurors in petitioner's case understood the challenged instructions to preclude consideration of relevant mitigating evidence," *ante,* at 386, is belied by both the plain meaning of the instructions and the context in which they were given. Because the instructions given to Boyde's jury were constitutionally inadequate under *any* standard, including the one adopted by the Court today, I dissent.

I

At the penalty phase of his trial, Richard Boyde presented extensive mitigating evidence regarding his background and character. He presented testimony regarding his impoverished background, his borderline intelligence, his inability to get counseling, and his efforts to reform. Friends and family testified that, notwithstanding his criminal conduct, Boyde possesses redeeming qualities, including an ability to work well with children.

In accordance with California's then-operative capital jury instructions, the trial court instructed the jury that it should "consider, take into account and be guided by" 11 sentencing factors in deciding whether to return a verdict of death. 1 California Jury Instructions, Criminal 8.84.1 (4th ed. 1979) (CALJIC). Because none of these factors explicitly in-

formed the jury that it could consider evidence of a defendant's background and character, see *People* v. *Easley*, 34 Cal. 3d 858, 878, 671 P. 2d 813, 825 (1983), Boyde argues that the trial court's instructions were constitutionally inadequate. The State responds that the instructions fully informed the jury of its responsibility to consider character and background evidence through factor (k), which provided that a jury could consider "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." Boyde replies that a reasonable juror could have understood factor (k) as permitting consideration only of evidence related to the circumstances of the crime.

## II

It is an essential corollary of our reasonable-doubt standard in criminal proceedings that a conviction, capital or otherwise, cannot stand if the jury's verdict *could* have rested on unconstitutional grounds. See, *e. g., Stromberg* v. *California*, 283 U. S. 359, 367–368 (1931); *Williams* v. *North Carolina*, 317 U. S. 287, 291–292 (1942); *Cramer* v. *United States*, 325 U. S. 1, 36, n. 45 (1945); *Yates* v. *United States*, 354 U. S. 298, 312 (1957); *Leary* v. *United States*, 395 U. S. 6, 31–32 (1969); *Bachellar* v. *Maryland*, 397 U. S. 564, 571 (1970); see also *Chapman* v. *California*, 386 U. S. 18, 24 (1967) ("[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt"). In a society that values the presumption of innocence and demands resolution of all reasonable doubt before stripping its members of liberty or life, the decision to leave undisturbed a sentence of death that could be constitutionally infirm is intolerable.

Contrary to the majority's intimation that the legal standard is "less than clear from our cases," see *ante*, at 378, we have firmly adhered to a strict standard in our review of challenged jury instructions. In *Sandstrom* v. *Montana, supra*, the petitioner claimed that the trial court's instructions un-

constitutionally shifted to him the burden of proof regarding his intent at the time of the crime. Rejecting the State's claim that the jury might not have understood the instruction in an unconstitutional manner, we declared that "whether a defendant has been accorded his constitutional rights depends upon the way in which a reasonable juror *could* have interpreted the instruction." *Id.*, at 514 (emphasis added). Because we had "no way of knowing that Sandstrom was not convicted on the basis of the unconstitutional instruction," *id.*, at 526, we held that his conviction must be set aside. Likewise, in *Francis* v. *Franklin*, 471 U. S. 307, 319 (1985), we applied *Sandstrom* to invalidate a conviction where "a reasonable juror could . . . have understood" that the instructions placed the burden of proof on the defendant. We emphasized that the "[t]he question . . . is not what the State Supreme Court declares the meaning of the charge to be, but rather what a reasonable juror *could have understood the charge as meaning.*" 471 U. S., at 315–316 (citing *Sandstrom, supra*, at 516–517) (emphasis added).

*Sandstrom* is equally applicable to claims challenging the constitutionality of capital sentencing instructions. See, *e. g.*, *California* v. *Brown*, 479 U. S. 538, 541 (1987) (in deciding whether a "mere sympathy" instruction impermissibly excludes consideration of mitigating evidence, " '[t]he question . . . [is] what a reasonable juror could have understood the charge as meaning' ") (quoting *Francis, supra*, at 315–316). As recently as *Mills* v. *Maryland*, 486 U. S. 367 (1988), this Court unequivocally confirmed that, in reviewing sentencing instructions alleged to preclude full consideration of mitigating circumstances, "[t]he critical question . . . is whether petitioner's interpretation of the sentencing process is one a reasonable jury *could* have drawn from the instructions given by the trial judge." *Id.*, at 375–376 (citing *Francis, supra*, at 315–316; *Sandstrom*, 442 U. S., at 516–517; and *Brown, supra*, at 541) (emphasis added).

These cases leave no doubt as to the appropriate standard of review.[1] To be sure, the *dissent* in *Francis* disagreed with what it acknowledged to be "the Court's legal standard, which finds constitutional error where a reasonable juror *could* have understood the charge in a particular manner." 471 U. S., at 332 (REHNQUIST, J., dissenting). But the *Francis* majority squarely and unqualifiedly rejected the dis-

---

[1] The majority attributes some of the uncertainty regarding the proper standard to this Court's decision in *Andres* v. *United States*, 333 U. S. 740, 752 (1948), quoting the Court as follows: "'That reasonable men might derive a meaning from the instructions given other than the proper meaning . . . *is probable.*" *Ante*, at 379 (ellipsis and emphasis added by majority). The majority fails to quote the Court's following sentence, in which the Court declared that "[i]n death cases doubts such as those presented here should be resolved in favor of the accused." 333 U. S., at 752. Read in context, the passage suggests only that in a case where an instruction was probably misinterpreted, any doubt must be resolved in favor of the accused; it does not suggest, as the majority implies, that it *must* be probable that an instruction could be misinterpreted before a conviction will be overturned.

The majority likewise mischaracterizes this Court's holding in *Bachellar* v. *Maryland*, 397 U. S. 564, 571 (1970). The majority suggests that *Bachellar* turned on the fact that it was "'equally likely that the verdict . . . rested on an unconstitutional ground,'" *ante*, at 380 (quoting 397 U. S., at 571) (ellipsis added by majority), and that *Bachellar* thus reflects only our refusal "to choose between two such likely possibilities," *ante*, at 380. The majority's misrepresentation of the *Bachellar* holding becomes apparent when the ellipsis inserted by the majority is removed:

"[S]o far as we can tell, it is equally likely that the verdict resulted 'merely because [petitioners' views about Vietnam were] themselves offensive to their hearers.' *Street* v. *New York*, [394 U. S. 576, 592 (1969)]. Thus, since petitioners' convictions *could have rested on an unconstitutional ground*, they must be set aside." 397 U. S., at 571 (emphasis added).

As the complete quotation makes clear, the *holding* in *Bachellar* is that a conviction cannot stand if it "could have rested on an unconstitutional ground." The Court's observation that, in the case before it, the verdict was "equally likely" to be unconstitutional was just that—an observation. See also *id.*, at 569 ("[I]n light of the instructions given by the trial judge, the jury *could* have rested its verdict on a number of grounds") (emphasis added).

sent's proposal that, for constitutional error to be found, there must be something more than a "reasonable possibility of an unconstitutional understanding" of the challenged instruction. *Id.*, at 323, n. 8. As the *Francis* Court stated, "it has been settled law since *Stromberg* v. *California*, 283 U. S. 359 (1931), that when there exists a reasonable possibility that the jury relied on an unconstitutional understanding of the law in reaching a guilty verdict, that verdict must be set aside." *Ibid.*

The majority defends the adoption of its "reasonable likelihood" standard on the ground that it "better accommodates the concerns of finality and accuracy than does a standard which makes the inquiry dependent on how a single hypothetical 'reasonable' juror could or might have interpreted the instruction." *Ante*, at 380. The majority fails, however, to explain how the new standard differs from *Sandstrom*'s "could have" standard other than to suggest that the new standard, unlike *Sandstrom*'s, requires more than "speculation" to overturn a capital sentence. *Ibid.* It is difficult to conceive how a *reasonable* juror *could* interpret an instruction unconstitutionally where there is no "reasonable likelihood" that a juror would do so. Indeed, if the majority did not explicitly allow for such a possibility, lower courts would have good reason to doubt that the two standards were different at all; the majority's more stringent version of the "reasonable likelihood" standard is inconsistent with the cases from which the majority appropriates that standard.

The "reasonable likelihood" language first appeared in *Napue* v. *Illinois*, 360 U. S. 264 (1959), in which the Court reversed a state-court determination that a prosecutor's failure to correct perjured testimony did not affect the verdict. The Court rejected the claim that it was "bound by [the state court's] determination that the false testimony could not *in any reasonable likelihood* have affected the judgment of the jury." *Id.*, at 271 (emphasis added). Based on its own re-

view of the record, the Court overturned the defendant's conviction because the false testimony *"may have had an effect on the outcome of the trial."* *Id.*, at 272 (emphasis added). The language in *Napue* thereafter provided the governing standard for determining whether a prosecutor's knowing use of perjured testimony mandates reversal of a sentence. See *United States* v. *Bagley*, 473 U. S. 667, 679, n. 9 (1985) (opinion of BLACKMUN, J.).

As JUSTICE BLACKMUN explained in *Bagley*, the "reasonable likelihood" standard should be understood to be an equivalent of the "harmless error" standard adopted in *Chapman* v. *California:*

> "The rule that a conviction be obtained by the knowing use of perjured testimony must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict derives from *Napue* v. *Illinois.* *Napue* antedated *Chapman* v. *California*, 386 U. S. 18 (1967), where the 'harmless beyond a reasonable doubt' standard was established. The Court in *Chapman* noted that there was little, if any, difference between a rule formulated, as in *Napue*, in terms of 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction,' and a rule 'requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' 386 U. S., at 24. It is therefore clear . . . that this Court's precedents indicate that the standard of review applicable to the knowing use of perjured testimony is equivalent to the *Chapman* harmless-error standard." 473 U. S., at 679–680, n. 9 (citations and internal quotation marks omitted).

The history of the "reasonable likelihood" standard thus confirms that the majority's version of the standard has no precedential support; where the Court has used "reasonable like-

lihood" language in the past, it has regarded such language as focusing, no less than the standards in *Chapman* and *Sandstrom*, on whether an error *could* have affected the outcome of a trial. See *supra*, at 389–393.[2]

To the extent the Court's new standard does require a defendant to make a greater showing than *Sandstrom*, the malleability of the standard encourages ad hoc review of challenged instructions by lower courts. Although the standard, as the majority adopts it, requires a defendant challenging the constitutionality of an instruction to demonstrate more than a reasonable "possibility" that his jury was "impermissibly inhibited by the instruction," a defendant "need not establish that the jury . . . more likely than not" was misled. *Ante*, at 380. Beyond this suggestion that error must be more than possible but less than probable, the Court is silent. Thus, appellate courts, familiar with applying the *Sandstrom* standard to ambiguous instructions, are now required to speculate whether an instruction that *could* have been misunderstood creates a "reasonable likelihood" that it was in fact misunderstood. *Ante*, at 380. I cannot discern how principled review of alleged constitutional errors is advanced by

---

[2] That the majority perceives little difference between our longstanding approach to challenged jury instructions and its reformulated "reasonable likelihood" standard suggests an alarming insensitivity to the premises underlying our criminal justice system. Just as the "reasonable doubt" standard at trial reflects our awareness of the meaning and serious consequences that our society attaches to a criminal conviction, the insistence on reasonable certainty in the correctness of capital sentencing instructions is commensurate with our heightened concern for accuracy in capital proceedings. Thus, the majority's assertion that "there may not be great differences among these various phrasings," *ante*, at 379, is unfounded. To the contrary, in reviewing criminal judgments we have described the difference between a standard that demands reasonable certainty on the one hand, and one that tolerates significant doubt on the other, as the difference that sets apart "a society that values the good name and freedom of every individual." *In re Winship*, 397 U. S. 358, 363–364 (1970).

this standard.[3]  That this Court has regarded the two standards as identical in prior cases, see *supra*, at 393, will no doubt contribute to confusion in the lower courts.

More fundamentally, the majority offers no persuasive basis for altering our standard of review regarding capital instructions alleged to be constitutionally infirm.  Despite the majority's declaration to the contrary, our "strong policy in favor of accurate determination of the appropriate sentence in a capital case" is *not* equaled by our "strong policy against retrials" based on alleged deficiencies in jury instructions. *Ante*, at 380.  We have long embraced a commitment to resolving doubts about the accuracy of a death verdict in favor of a capital defendant.  See, *e. g.*, *Beck* v. *Alabama*, 447 U. S. 625, 637 (1980) ("[T]he risk of an unwarranted conviction . . . cannot be tolerated in a case in which the defendant's life is at stake").  Indeed, to characterize our commitment to accurate capital verdicts as a "policy" is inappropriately dismissive of our heightened dedication to fairness and accuracy in capital proceedings.  See, *e. g.*, *Bullington* v. *Missouri*, 451 U. S. 430, 445–446 (1981); *Woodson*, 428 U. S., at 304 (plurality opinion).

Moreover, the finality concerns to which the majority alludes are far less compelling in this context than the majority suggests.  In addressing certain post-trial challenges to presumptively valid convictions, this Court has identified specific justifications for requiring a heightened showing by a defendant.  Thus, the Court demands a showing greater than the "possibility" of error in reviewing a defendant's request

---

[3] Our repudiation of such a malleable standard in *Francis* v. *Franklin*, 471 U. S. 307 (1985), where we rejected a proposed "more likely than not" standard, is no less applicable here:

"This proposed alternative standard provides no sound basis for appellate review of jury instructions.  Its malleability will certainly generate inconsistent appellate results and thereby compound the confusion that has plagued this area of the law.  Perhaps more importantly, the suggested approach provides no incentive for trial courts to weed out potentially infirm language from jury instructions . . . ." *Id.*, at 322–323, n. 8.

for a new trial based on newly discovered evidence, *INS* v. *Abudu*, 485 U. S. 94, 107, n. 12 (1988), because the "finality concerns are somewhat weaker" in the context of such claims. *Strickland* v. *Washington*, 466 U. S. 668, 694 (1984). Our adoption of this "high standard for newly discovered evidence claims presuppose[d] that all the essential elements of a presumptively accurate and fair proceeding were present in the proceeding whose result [was] challenged." *Ibid.*

Likewise, in *Strickland*, the Court held that a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Ibid.* In adopting this more demanding standard, the Court relied heavily on the special circumstances which give rise to ineffective-assistance claims. In particular, the Court emphasized the government's inability to assure a defendant effective counsel in a given case and the difficulties reviewing courts face in discerning the precise effects of various representation-related errors:

> "Conflict of interest claims aside, actual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice. The government is not responsible for, and hence not able to prevent, attorney errors that will result in reversal of a conviction or sentence. Attorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial. They cannot be classified according to likelihood of causing prejudice. Nor can they be defined with sufficient precision to inform defense attorneys correctly just what conduct to avoid. Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another." *Id.*, at 693.

For these reasons, the Court in *Strickland* refused to overturn a verdict whenever a defendant shows that the errors of

his attorney "had some conceivable effect on the outcome of the proceeding." *Ibid.* Instead, the Court determined that the "reasonable probability" test more appropriately addresses the risk of error that attaches to ineffective-assistance claims in light of the fact that *all* trial decisions have *some* effect on the course of a trial.

In contrast, this case does not require the Court to relitigate facts or to speculate about the possible effects of alternative representation strategies that Boyde's counsel might have pursued at trial. Quite simply, the issue here is whether the trial court properly instructed the jury regarding its capital sentencing role. Such a challenge goes to the core of the accuracy of the verdict; it asks whether the defendant was sentenced by the jury according to the law. *Bollenbach* v. *United States*, 326 U. S. 607, 613 (1946) ("A conviction ought not to rest on an equivocal direction to the jury on a basic issue"). In such a circumstance, a capital defendant's interest in an exacting review of the alleged error is unquestionably at its height, because there is no "presumptive validity" regarding the jury's sentence. The State, on the other hand, retains no strong reliance interest in sustaining a capital verdict that may have been obtained based on a misunderstanding of the law.

Our refusal to apply a standard less protective than "reasonable doubt" to alleged errors in criminal trials in part guarantees the reliability of the jury's determination. But it also reflects our belief that appellate courts should not "invad[e] [the] factfinding function which in a criminal case the law assigns solely to the jury." *Carella* v. *California*, 491 U. S. 263, 268 (1989) (SCALIA, J., concurring in judgment) (internal quotation marks omitted; citations omitted). Thus, where jury instructions are unclear, an appellate court may not choose the preferred construction because "[t]o do so would transfer to the jury the judge's function in giving the law and transfer to the appellate court the jury's function of

measuring the evidence by appropriate legal yardsticks."
*Bollenbach, supra,* at 614.

This reasoning is no less applicable to California's capital sentencing proceedings, in which the factfinding function is assigned to the jury. See *Hicks* v. *Oklahoma,* 447 U. S. 343, 346 (1980) (where defendant "has a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion," it violates due process to affirm his sentence "simply on the frail conjecture that a jury *might* have imposed a sentence equally as harsh" had they been properly instructed). To ignore a reasonable possibility that jurors were misled about the range of mitigating evidence that they could consider is to undermine confidence that the *jury* actually decided that Boyde should be sentenced to death in accordance with the law. It overrides California's "fundamental decision about the exercise of official power—a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges." *Duncan* v. *Louisiana,* 391 U. S. 145, 156 (1968).

Accordingly, I would review the challenged instructions in this case to determine whether a reasonable juror *could* have understood them to preclude consideration of mitigating evidence regarding Boyde's character and background.

## III

Under any standard, though, the instructions are inadequate to ensure that the jury considered *all* mitigating evidence. The majority's conclusion that factor (k) would be understood by reasonable jurors to permit consideration of mitigating factors unrelated to the crime does not accord with the plain meaning of the factor's language.[4] A "circum-

---

[4] As the majority concedes, see *ante,* at 374, n. 2, several years after Boyde's trial, the California Supreme Court recognized the "potential misunderstanding" generated by the instructions challenged in his case and thereafter required lower courts to supplement the unadorned factor (k) instruction with language that would explicitly inform the jury that it could

stance which extenuates the gravity of the crime" unambiguously refers to circumstances *related to the crime*. Jurors, relying on ordinary language and experience, would not view the seriousness of a crime as dependent upon the background or character of the offender. A typical juror would not, for example, describe a particular murder as "a less serious crime" because of the redeeming qualities of the murderer; surely Boyde's murder of Gibson could not be considered less grave, as the majority suggests, because Boyde demonstrated that his "criminal conduct was an aberration from otherwise good character," *ante*, at 382–383, n. 5.[5] Rather, an offender's background and character unrelated to his crime should be considered by the sentencer because of society's deeply felt view that punishment should reflect *both* the seriousness of a crime *and* the nature of the offender. See, *e. g.*, *Penry* v. *Lynaugh*, 492 U. S. 302, 319 (1989) (a sentence should " 'reflect a reasoned *moral* response to the defendant's

---

consider any " 'aspect of [the] defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death.' " *People* v. *Easley*, 34 Cal. 3d 858, 878, n. 10, 671 P. 2d 813, 826, n. 10 (1983) (quoting *Lockett* v. *Ohio*, 438 U. S. 586, 604 (1978)).

[5] Thus, it is unsurprising that a criminal treatise, in describing the evolution of offense classification in our criminal system, reports that "serious offenses" such as murder, manslaughter, rape, and arson came to be called felonies, whereas other, presumably "less serious" offenses, came to be called misdemeanors. 1 C. Torcia, Wharton's Criminal Law § 17, p. 81 (14th ed. 1978); see also *Argersinger* v. *Hamlin*, 407 U. S. 25, 34 (1972) ("[E]ven in prosecutions for offenses less serious than felonies, a fair trial may require the presence of a lawyer"). The characterization of felonies, which are defined by certain offense-related elements, as serious crimes *regardless of the nature of the offender* captures our intuitive sense that a crime is not made less serious by factors extrinsic to it, but *only* by circumstances surrounding the offense itself. For similar reasons, the doctrine of justification and excuse in our criminal law focuses solely on factors related to the commission of the crime, such as duress, necessity, entrapment, and ignorance or mistake. See, *e. g.*, 1 W. LaFave & A. Scott, Substantive Criminal Law, Ch. 5 (1986).

background, character, and crime'" (quoting *California* v. *Brown*, 479 U. S., at 545 (O'CONNOR, J., concurring)).

## A

The majority resists the natural understanding of the instruction by focusing on language in *Penry* that describes "'the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, *may be less culpable than defendants who have no such excuse.'"* *Ante*, at 382 (quoting *Penry, supra,* at 319) (emphasis added by majority). According to the majority, this statement reveals that jurors could understand background and character evidence as extenuating the seriousness of a crime. But this language does not prove what the majority would have it prove. The language tells us, as is clear from several of our cases, that a criminal defendant may be considered *less culpable* and thus less deserving of severe punishment if he encountered unusual difficulties in his background, suffers from limited intellectual or emotional resources, or possesses redeeming qualities. See, *e. g., Woodson*, 428 U. S., at 304 (plurality opinion). The language in *Penry* does not, however, suggest that because an offender's culpability is lessened his crime, too, is less serious. Rather than answering the central question of this case—whether character and background evidence can be regarded as "extenuat[ing] the gravity of the crime" as opposed to lessening the offender's moral culpability—*Penry* simply confirms that an offender's background and character, apart from his crime, must be considered in fixing punishment.[6]

---

[6] To the extent it has spoken to the issue, this Court supports the view that circumstances that extenuate the gravity of a crime are analytically distinct from evidence regarding an offender's character and background. The commitment to considering background and character evidence in our capital punishment jurisprudence is traceable, in part, through *Woodson*, to the following passage in *Pennsylvania ex rel. Sullivan* v. *Ashe*, 302 U. S. 51, 54–55 (1937) (emphasis added): "[P]unishment of like crimes may

The majority appears to rest its position on the assumption that it would be nonsensical, given society's "long held" belief that character and background evidence is relevant to a sentencing determination, to conclude that the jury might have thought that it could not consider such evidence. *Ante,* at 381–382. If the value of giving effect to such mitigating evidence is so deeply held, the assumption holds, surely the jury could not have been misled by the trial court's instructions. The sad irony of the majority's position is that, under its reasoning, the more fundamentally rooted a legal principle is in our constitutional values, the less scrutiny we would apply to jury instructions that run counter to that principle. For example, because "the presumption of innocence [is] that bedrock 'axiomatic and elementary' principle whose 'enforcement lies at the foundation of the administration of our criminal law,'" *In re Winship,* 397 U. S. 358, 363 (1970) (quoting *Coffin* v. *United States,* 156 U. S. 432, 453 (1895)), the majority apparently would resolve doubts about the adequacy of a reasonable-doubt instruction against the accused on the assumption that jurors share our "long held" belief in the presumption of innocence. The majority's position would therefore encourage trial courts to be exacting in their instructions regarding legal minutiae but leave in barest form instructions regarding those principles "indispensable to command the respect and confidence of the community in applications of the criminal law." 397 U. S., at 364. Because this argument inverts the degree of concern we should exhibit toward fundamental errors in criminal proceedings, it is unacceptable.

B

As the majority maintains, the adequacy of an instruction must be judged "'in the context of the overall charge.'"

be made more severe if committed by ex-convicts. . . . For the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense *together with* the character and propensities of the offender."

*Ante,* at 378 (citations omitted). Nothing in the charge here, however, overcame the constitutional inadequacy of factor (k) in failing to instruct the jury to consider all mitigating evidence.

The majority suggests that factor (k), by referring to " '[a]ny *other* circumstance which extenuates the gravity of the crime'" (emphasis added), signaled that character and background evidence could be considered because "[o]ther factors listed in CALJIC 8.84.1 allow for consideration of mitigating evidence not associated with the crime itself." *Ante,* at 378, 383. The majority thus believes that the jury would be unlikely to read a limitation into factor (k) that was not shared by all of the "other" factors to which the prefatory language in factor (k) refers. But the "any other" language in factor (k) need not refer to *all* of the preceding factors; it could well refer *solely* to those factors that permit consideration of mitigating evidence related to the offense.[7] The understanding of the instruction must turn on the meaning of "circumstance which extenuates the gravity of the crime," not on factor (k)'s prefatory language. Because that phrase unambiguously refers to circumstances related to the crime, one cannot reasonably conclude on the basis of the scope of the other factors that the jury understood factor (k) to encompass mitigating evidence regarding Boyde's character and background.

Equally unpersuasive is the majority's claim that Boyde's presentation of extensive background and character evidence itself suggests that the jurors were aware of their responsibility to consider and give effect to that evidence. This argument is foreclosed by *Penry,* where we stated that "it is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be

---

[7] Indeed, at least seven of the ten factors preceding factor (k)—factors (a), (d), (e), (f), (g), (h), and (j)—relate solely to circumstances surrounding the commission of the offense. See *ante,* at 373–374, n. 1 (quoting complete instruction).

able to consider and give effect to that evidence in imposing sentence." 492 U. S., at 319. Thus, mere presentation of mitigating evidence, in the absence of a mechanism for giving effect to such evidence, does not satisfy constitutional requirements.

The majority attempts to avoid this conclusion by characterizing this case as unlike those in which the instructions "clearly directed the sentencer to disregard evidence." *Ante*, at 384. Implicit in this claim is the view that the Constitution is satisfied when the sentencing instructions do not explicitly preclude the jury from considering all mitigating evidence. In other words, the Constitution provides no *affirmative* guarantee that the jury will be informed of its proper sentencing role. This view is unsupportable.

The Court in *Lockett*, faced with statutory restrictions on the consideration of mitigating evidence, framed the relevant question in that case to be whether the instructions "prevent[ed] the sentencer . . . from giving independent mitigating weight to aspects of the defendant's character." 438 U. S., at 605. We have understood this principle affirmatively to require the sentencing court to alert the jury to its constitutional role in capital sentencing. Thus, in *Penry*, we overturned a death sentence because the jury was not informed that it could consider mitigating evidence regarding Penry's mental retardation and childhood abuse. It was "the *absence* of instructions informing the jury that it could consider and give effect to the mitigating evidence" that was dispositive. 492 U. S., at 328 (emphasis added); see also *Brown*, 479 U. S., at 545 (O'CONNOR, J., concurring) ("[T]he jury instructions—taken as a whole—*must clearly inform* the jury that they are to consider any relevant mitigating evidence about a defendant's background and character" (emphasis added)); cf. *Sumner* v. *Shuman*, 483 U. S. 66, 76 (1987) ("Not only [does] the Eighth Amendment require that capital-sentencing schemes permit the defendant to present any relevant mitigating evidence, but '*Lockett* requires the

sentencer to listen' to that evidence") (quoting *Eddings* v. *Oklahoma*, 455 U. S. 104, 115, n. 10 (1982)).   The Court cannot fairly conclude, then, that the mere presentation of evidence satisfied Boyde's right to a constitutionally adequate sentencing determination.

Finally, in examining the context of the sentencing instructions, the majority finds "no objectionable prosecutorial argument" that would reinforce an impermissible interpretation of factor (k).   Although the prosecutor "'never suggested that the background and character evidence could not be considered,'" *ante*, at 385 (quoting 46 Cal. 3d 212, 251, 758 P. 2d 25, 47 (1988)), he did not need to.   Factor (k) accomplished that purpose on its own, and the prosecutor, to make his point, needed only to repeat that language to the jury.

In his opening penalty phase argument to the jury, the prosecutor described some of the background and character evidence that Boyde had offered and asked rhetorically: "[D]oes this in any way relieve him or . . . in any way suggest that this crime is less serious or that the gravity of the crime is any less; I don't think so."   App. 24.   The majority suggests that this argument merely went to the *weight* the jury should assign to Boyde's character and background evidence. *Ante*, at 385–386.   But the argument directly tracks the language of factor (k) specifying what evidence may be considered, not what weight should be attached to such evidence. The argument does not suggest that Boyde's background and character evidence was untrue or insubstantial, but rather emphasizes that the evidence did not, indeed could not *in any way*, lessen the seriousness or the gravity of the crime itself.

The prosecutor's closing statement likewise reinforced the message that evidence unrelated to the crime did not fall within the scope of factor (k): "If you look and you read what it says about extenuation, it says, 'To lessen the seriousness of a crime as by giving an excuse.'   Nothing I have heard lessens the seriousness of this crime."   App. 29.   Again, the prosecutor designed his argument to bring home to the jury

the plain meaning of the sentencing instructions. That the argument focuses more on the language of factor (k) than on the substance of Boyde's mitigating evidence confirms that the prosecutor sought to prevent the jury from considering non-crime-related evidence.

Nor is this a case in which potentially misleading prosecutorial argument can be discounted because the trial court's instructions satisfactorily informed the jury of its proper sentencing role. Rather, the prosecutor exploited the constitutional inadequacy of factor (k) and sought to ensure that the limited scope of factor (k) did not escape the attention of the jury. Thus, *both* the prosecutor's comments and the trial court's charge failed to communicate to the jury that it could give effect to mitigating character and background evidence. At the very least, a reasonable juror *could* have understood the charge and the prosecutor's arguments as so limited. Accordingly, neither the words of the charge nor the context in which they were given provide sufficient assurance that the jury considered all mitigating evidence.

## IV

"When the State brings a criminal action to deny a defendant liberty or life, . . . 'the interests of the defendant are of such magnitude that historically and without any explicit constitutional requirement they have been protected by standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment.'" *Santosky* v. *Kramer*, 455 U. S. 745, 755 (1982) (quoting *Addington* v. *Texas*, 441 U. S. 418, 423 (1979)). I cannot conclude with any confidence that Boyde's jury understood that it could consider, as mitigating factors, evidence of Boyde's difficult background and limited personal resources.[8] That the majority regards

---

[8] For the reasons canvassed in JUSTICE BRENNAN's dissent in *Blystone* v. *Pennsylvania*, *ante*, p. 299, I also believe that the mandatory language of California's sentencing scheme deprives a capital defendant of an independent judgment by the sentencer that death is the appropriate punishment. Like the instruction in *Blystone*, Boyde's instruction required the

confidence in such a conclusion as unnecessary to its affirmance of Boyde's death sentence reflects the Court's growing and unjustified hostility to claims of constitutional violation by capital defendants. When we tolerate the possibility of error in capital proceedings, and "leav[e] people in doubt," *In re Winship*, 397 U. S., at 364, whether defendants undeserving of that fate are put to their death, we hasten our return to the discriminatory, wanton, and freakish administration of the death penalty that we found intolerable in *Furman* v. *Georgia*, 408 U. S. 238 (1972).

## V

Adhering to my view that the death penalty is in all circumstances cruel and unusual punishment prohibited by the Eighth and Fourteenth Amendments, *Gregg* v. *Georgia*, 428 U. S., at 231–241 (MARSHALL, J., dissenting), I would in any case vacate the decision below affirming Boyde's death sentence.

---

sentencer to deliver a verdict of death if the aggravating circumstance or circumstances, no matter how insubstantial, outweighed the mitigating circumstances. Channeling sentencing discretion is indeed an essential aspect of a constitutional capital punishment scheme, but it should not be understood to deprive the sentencer of the choice to reject the ultimate sanction where the aggravating circumstances do not warrant it.