**STATE of Missouri, Respondent,**

v.

**Donald Raymond SALATA, Appellant.**

No. WD 45287.

Missouri Court of Appeals,
Western District.

June 15, 1993.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 27, 1993.

Application to Transfer Denied
Sept. 28, 1993.

Ellen H. Flottman, Office of the State Public Defender, Columbia, for appellant.

William L. Webster, Atty. Gen. and Hugh L. Marshall, Asst. Atty. Gen., Jefferson City, for respondent.

Before SMART, P.J., and SHANGLER and FENNER, JJ.

SHANGLER, Judge.

The defendant Donald Salata appeals from a conviction by a jury for abuse of a child in violation of § 568.060, RSMo 1986. The information charged that Salata "knowingly photographed J.R., a child less than seventeen years old, while J.R. was nude and covered with excrement for the purpose of sexual stimulation and gratification of any individual who may view such depiction." The evidence viewed in the light most favorable to the verdict was as follows.

J.R. and his parents and sister lived in California, Missouri. The mother was having difficulty toilet training J.R., then almost four years of age, so she responded to an advertisement in the November/December, 1988, issue of *Child* magazine for a "Freedom from Diapers" kit from the J.S. Campbell Company. She found the kit unsatisfactory and returned it for a refund. The company replied with a refund check and a letter referring her to the defendant, Donald Salata.

The mother wrote to Salata to ask if he could help with a toilet training program for J.R. Salata responded with a letter which informed her that he was working toward a doctorate degree focused on the

etiology and treatment of encopresis [soiling] and enuresis [wetting], and that he had experience designing toilet training programs for children. Salata requested that the mother record all of J.R.'s toilet training behavior over a two-week period and provided a questionnaire for her to complete and return. He also requested that she send two photographs of J.R. dressed only in shorts or diapers to allow Salata to determine the child's physical characteristics. The mother mailed Salata the completed questionnaire, information chart and four photographs of J.R. in shorts. Salata wrote back asking for photographs of J.R. in diapers, and the mother complied. The mother assumed her correspondence with Salata would be confidential.

In March of 1989, Salata visited J.R.'s home to present his toilet training program in person, equipped with camera and tape recorder. He asked for, and received, permission to take J.R. to a park alone, returned for lunch, and went out again to another park. Salata had his tape recorder with him. Salata made other visits during May, August, and September of 1989, ostensibly to attempt to toilet train J.R. according to a program Salata had devised.

On September 4, 1989, Salata took J.R. out in his van. He had a camera, borrowed the mother's tape recorder, and they went to an area behind the California elementary school. An unidentified observer saw Salata and J.R. and called the sheriff's office to report that a man was taking nude pictures of a boy on the playground behind the schoolhouse. The officers found Salata and J.R., wearing only jeans, in the van. They requested the tape recorder and camera from Salata, and he complied. Salata had no driver's license, so the officers took him to the sheriff's office. An officer played the tape in the recorder, gave him the Miranda warnings, and placed him under arrest.

The officers searched the van under a warrant and found and seized a variety of letters, tapes and photographs. Among them was a camera containing exposed films which, when developed, included a photograph of J.R. lying on his back in Salata's van, exposing his excrement-smeared buttocks next to an open, soiled diaper. Salata admitted that this photograph had been taken on September 3, 1989, the day before his arrest. The search also disclosed an unsent letter from Salata to "Ron and Kay," discussing his work in designing a toilet training program for J.R., and referring to a "Wisconsin Baby Club" gathering. Another letter, from Salata to "Larry" referred to "the next Wisconsin Baby Club diaper party," included photographs of a child in diapers named Andrew, and was signed, "Fraternally yours, Dirty Don." A letter to "Gene and Dee" stated that "J.R. is a good candidate to remain a sporadic pants messer throughout his childhood and perhaps continue it throughout his adulthood, following in my footsteps. Some other letters were found relating to Salata's relish for wearing diapers and for children in diapers.

There were also various letters addressed to Salata. One letter from "Billy" to "Baby Donny" read:

> J.R. must have been a lot of fun to watch. And by the smile on his face he really enjoys being in just his diapers. But doesn't it make you feel a little strange inside, kind of excited and embarrassed at the same time?

A letter from "Baby Paul" to "Dirty Donny" read:

> Just love the photos you sent showing the little boys wearing their diapers. You look real good sitting on the couch in just your diapers, plastic pants. I really enjoyed reading the questionnaire to the parents of J.R. I can really relate to what J.R. was going through and to what he was doing.

A letter from "George" read:

> I really like the pictures of J.R. in the park. The shot of him standing with his back to the camera while he looked out on the lake is an outstanding photo. If you could, would you make me a 5x7 or 8x10 of this picture? I will pay you for it. It is really a great picture.

Melvin Kofkee wrote to Salata about J.R.:

> Man, J.R. sounds like a one of a kind boy. I hope his mom keeps allowing him to enjoy his diapers, though surely he must be near school age. Darn, I was hoping J.R. would be open minded to at least trying to use the baby bottle or sit/stand in a crib. At least for a pose. Does he have any bib overalls, bib shortalls or sleepers, blanket sleepers or footed pajamas? What about posing wearing a bib? Wow, the boy J.R. enjoys diapers, yet won't try a bottle or crib if just to stand in? Whose playpen was he standing next to?

The letter by Marvin Chetki of April 11, 1989 said:

> Got your letter, stories, photo and the three individual tapes the other day.
>
> \* \* \*
>
> You had asked about getting a copy of the tape showing the children. I will try to get another copy although it may take a few weeks. The fellow I got it from originally just wrote that he would be out of town until sometime in May.

The letter by Marvin Chetki of June 28, 1989 said:

> By the time you get this package you should already have gotten the letter I mailed this morning. So this will be a brief [no pun intended] note. The tape containing our baby photos and some of my messy videos is for you to keep if you wish.
>
> \* \* \*
>
> Well enough of that. Let me know how you liked the tape. The other tape is still photos of kids I just received a few weeks ago. Not great but still interesting. Take your time returning it and feel free to try making a copy if you wish. I will try to get a copy of the other "kid-vid" for you.

These tapes, admitted in evidence, were found in the van and contained child pornography. The "earlier letter" referred to in the Chetki letter of June 28, 1989, read:

> ... I really enjoy the stories you enclose! I like to read them over and over while I lie in bed jacking-off. A few of the other guys have sent photos of themselves with their diapers down.... Some of the photos were taken after they had messed their diapers, and show poop smeared all over their balls and cocks, which fits really nicely with the action in the stories.

A number of articles were also seized, among them, copies of a letter to the editor from a magazine called *Justice Weekly*, entitled, "Letters to the Editor. Mother has diapers for youngster, plastic panties for their fathers;" copies of an article called "Adult Babies;" copies of an article titled "Sex and Toilet Training," and the June 15, 1988, issue of *Diaper Pail Fraternity*. Salata was mentioned in that publication: "We want thank Donny Salata, P.O. Box 8, Madison, Wisconsin ... for sending us these wonderful articles on encopresis. To cap things off, Donny wrote a wonderful true story about how he relearned to mess in his diapers at age seven." The story mentioned was offered for sale under the title "Personal Pooping Experiences."

Salata had placed a personal ad in this magazine:

> I like to read about others' experiences in diapers, true/fantasy, especially childhood stories. I collect stories, photos and study, professionally, children/adolescents who use diapers—wet/mess their pants. There are a lot.

The discovery in the van of these and other items prompted a search of a basement of a residence in Madison, Wisconsin, into which Salata was in the process of moving. More letters and several photograph albums were discovered. One letter, received in evidence, discussed Salata's lifelong obsession with wearing and soiling diapers. It also described Salata's association between soiled diapers and sexual arousal, which began as a child:

> Masturbation had now become a fixed part of my diaper wearing ritual. I experienced my first orgasm, dry while climbing a pole in our backyard with a freshly

loaded diaper on. The orgasm nearly knocked me off the pole. Ever since then I've had a strong association between messy diapers/pants and masturbation.

A letter addressed: "Dear Tommy and Marky" discussed "the toilet training case of four year old J.R." that Salata was working on. It discussed J.R.'s fondness for soiling his diapers and smashing his excrement. It commented, "It looks like a future messy DPFer coming up through the ranks—following in my own footsteps." It was signed, "Dirty Don."

Found in the residence from which Salata was moving were more items from the *Diaper Pail Fraternity*, among them, a photo album, magazine and newsletter. An order form from the June, 1989, *Diaper Pail Fraternity* newsletter had been filled out by Salata to request a number of different stories involving wet and/or soiled diapers, listed on the form as relating to masturbation, oral sex, bondage and other subjects.

A cassette audiotape labeled "To Chris from Don" featured a letter dictated to one Chris Taylor, which mentioned a note by Salata to DPF about his treatment to J.R. The tape discussed Salata's first orgasm, which he recounted occurred with a loaded diaper when he was about eight or nine years of age. Salata stated that he felt he had developed a diaper fetish earlier in his life than psychologists now recognize as possible:

> The train of thought right now is that no objects can become a fetish in childhood, can't become a fetish in childhood. They become—you have transitional objects in childhood. Objects that bring particular security to a child, that later when the child reaches adolescence can become a fetish.

> But I'd have to admit or feel that my own experience as a kid was that diapers had become a fetish much earlier than my adolescence. I remember thinking of diapers and seeing other kids in diapers and getting an erection, even in the first grade—first, second grade getting an erection at seeing that and thinking boy was that—would that be neat.

While in jail, Salata wrote a letter to J.R.'s parents to reassure them that he never molested J.R. nor ever had any intention of doing so. He wrote that he did not know that the intentions of some of the members of the fetish organization, from which he was obtaining information "were not completely honest or moral." He described the man who had sent him the videos [Chetki], with whom Salata had corresponded about children masturbating, as a "dangerous pedophile," and that the videos "sickened" him. The letter explained that he had been encopretic since a child and that the condition took on aspects of a fetish in his adolescence. He wrote that when he discovered the *Diaper Pail Fraternity*, he assumed that "all of these members were just like me." He discovered that "there were all types of transvestites, homosexuals, pedophiles, even social psychopaths." He stated that when he began to study the problem in the professional literature and working with children, the "magical aspects of diapers, wetting and messing" disappeared for him, and the "reality of the disorder was brought home." He acknowledged that he had not completely shaken his fetish. Salata explained that he took the nude photograph of J.R. with smeared feces for the mother so that she could see "the extent to which J.R. engaged in smearing his BM on his own at no encouragement from me." He explained: "In fact I find kids messy diapers and pants as repulsive as you probably do."

Dr. Colette Belanger, a psychologist, testified for the defense. She had evaluated and counseled Salata. She testified that the treatment of encopretics was part of her profession, and that Salata was both an encopretic and also an infantilist—a person who seeks security in regression to infancy. In a state of regression, Salata's reactions would be those of a child and not an adult. As such, he would be incapable of understanding sexual stimulation or gratification. She testified that Salata was not a pedophile.

Salata testified in his defense. He was a student at the University of Wisconsin, but not at the graduate level. He was studying encopresis, which he defined as "the defecation in inappropriate places more than once a month in children four years or older." He took up the study because he himself had been encopretic as a child, as a youngster and through adolescence. He had written a term paper on the subject and intended to write his doctoral dissertation on encopresis. As he became more knowledgeable in the subject, he received referrals from the Campbell company to parents who needed assistance in toilet training. He took photographs of J.R. and other children he was training because encopretic children display certain similar physical characteristics. He suspected J.R. of being deliberately retentive, which he explained can be observed through the defecating posture of the child. The nude photograph taken of J.R. "was meant for nobody's eyes except his parents."

Salata acknowledged that he had corresponded with members of the "Diaper Pail Fraternity," some of whom received sexual satisfaction from excrement. He did so to determine from the experience of others more about himself and his disorder. He acknowledged corresponding with members about their psycho-sexual tendencies, including Chetki, who was both a coprophiliac [one sexually aroused by feces] and a child pornographer/pedophile. Salata sought to portray himself as having the same interests as those with whom he corresponded. He testified that he received no sexual gratification or stimulation from J.R. or photographs of him. Nor did he receive sexual gratification from his studies and activities. He was proud of his success in working with children like J.R.

The jury found Salata guilty of the offense charged, and the defendant was sentenced to a term of five years in custody of the Missouri Department of Corrections.

The first point on appeal contends that the denial of the defendant's motion for acquittal at the conclusion of all the evidence was error in that the prosecution evidence was not sufficient to prove beyond a reasonable doubt that the photograph Salata took of J.R. "was of a child engaging in a prohibited sexual act", as defined by Section 568.080, since the evidence failed to establish both "nudity" and "nudity to be depicted for the purpose of sexual stimulation or gratification," as required by the statute.

■ Salata was charged with the class C felony, abuse of a child, in violation of § 568.060, RSMo 1986:

1. A person commits the crime of abuse of a child if he:

.    .    .    .    .

(2) Photographs or films a child less than seventeen years old engaging in a prohibited sexual act ...

.    .    .    .    .

2. As used in this section **"prohibited sexual act"** means any of the following, whether performed or engaged in either with any other person or alone: ... nudity, if such nudity is to be depicted for the purpose of sexual stimulation or gratification of any individual who may view such depiction.

The basis for the conviction was a photograph Salata took of J.R. on the day before the arrest. It shows J.R. lying on his back with his jeans pulled down below his knees with his diaper removed. J.R.'s right leg is hiked so that his genitals are concealed, but the posture of the child is such as to expose his buttocks, heavily smeared with excrement, in almost full view.

The defendant argues that "this is not nudity for purposes of the child abuse statute ... [o]nly that nudity depicted 'for purpose of sexual stimulation or gratification' is criminalized." Indeed, *State v. Helgoth*, 691 S.W.2d 281 (Mo. banc 1985), explains that the effect of the statute "is to prohibit photographing nude children with the specific purpose that the depictions thereby created be used for sexual stimulation or gratification." *Id.* at 283[2, 3]. Where, as charged against Salata, the "prohibited sexual act" photographed is nudity, it is the intent of the photographer that the nudity is depicted "for the purpose of sexu-

al stimulation or gratification of any individual who may view" it that is the issue. § 568.060.2. The standard is a subjective one the actor's state of mind. *State v. Helgoth*, 691 S.W.2d at 283[2, 3].

Salata argues that the photograph does not depict nudity. The argument acknowledges that *State v. Foster*, 838 S.W.2d 60 (Mo.App.1992), attributes to the term *nudity* in child abuse section 568.060 the meaning of common usage, "inadequately or partially clothed esp. so as to be socially unacceptable." *Id.* at 68[16, 17]; Webster's Third New Int'l Dictionary (1966). We find, as did *Foster*, that this definition fits easily within the child protection purpose of the statute. J.R. was nude in the photograph taken of him and used in evidence.

The defendant acknowledges that although *Foster* holds that *nudity* "cannot be defined for purposes of child abuse as it is for obscenity", *Id.* at 68 [1], the argument insists nevertheless that "the definition of nudity of a pre-pubertal child *must* mean the depiction of the genitalia of that child." The argument concludes that "[n]o other definition is logical or justifies both *Foster* and *Helgoth.*" The rationale in *Foster* is an express repudiation of that premise, and that in *Helgoth* rejects the argument that the statute lacks guidelines "as to what sort of nudity will result in the 'sexual stimulation or gratification of any person.' " *State v. Helgoth*, 691 S.W.2d at 283[1]. The argument then has resort to statutory constructs of Massachusetts and Colorado [2], each of which defines *nudity* in multiform terms of the human female breast and genitals or pubic area. The statute we construe, however, is expressed in different terms, and those are the terms that govern our decision.

Salata argues also that the prosecution evidence does not prove a submissible issue that the photograph was of nudity "depicted for the purpose of sexual stimulation or gratification of any individual who may view such depiction" within § 568.060.2. He points to the amendment of § 568.060 in 1990, after the conviction, to include "fetishism" within the definition of prohibited sexual act, as evidence that the conduct charged was not intended by the legislature to be covered under the section as then written.[3]

There is a presumption that an amendment is meant to accomplish some legislative purpose. That rests on the premise that the Legislature may not be charged with doing a useless act. *State v. Rellihan*, 662 S.W.2d 535, 545[8–14] (Mo.App.1983); *Hogan v. Kansas City*, 516 S.W.2d 805, 811[4, 5] (Mo.App.1974). The presumption that the legislature knows the prior construction of the original act given by the courts is a circumstance in the determination of the intended purpose of an amendment to that act. *Citizens Elec. Corp. v. Director of Dep't of Revenue*, 766 S.W.2d 450, 452[3, 4] (Mo. banc 1989). Accordingly, at the enactment of the amendment, the legislature was aware that the void for vagueness contention against the due process of law validity of § 568.060 was confronted and answered by the supreme court en banc in *Helgoth* both as to the *nudity* and *sexual stimulation or gratification of any person* elements of that criminal statute. *Helgoth* holds expressly: "The effect of the statute as it applies to the defendant's actions is to prohibit photographing nude children with the specific purpose that the depictions thereby created be used for sexual stimulation or gratifica-

---

1. Chapter 573, PORNOGRAPHY AND RELATED OFFENSES, § 573.010, Definitions (7) **"Nudity"**, the showing of post-pubertal human genitals or pubic area, with less than a fully opaque covering.

2. Mass.Gen.Laws Ann. ch. 272, Sec. 31 (1986 ed.) and Colo.Rev.Stat. Sec. 18–6–403 (1988).

3. Section 568.060.2, RSMo Cum.Supp.1993, the present enactment, provides: "As used in this

section **"prohibited sexual act"** means any of the following ...: sexual or anal intercourse, masturbation, bestiality, sadism, masochism, fetishism ..."

Section 568.060.4 of the present act provides: "As used in this section, the word **"fetishism"** means a condition in which erotic feelings are excited by an object or body part whose presence is psychologically necessary for sexual stimulation or gratification."

tion." 691 S.W.2d at 283. And, again: "The statute gives manifest warning that anyone taking nude pictures of children less than seventeen years of age is taking great risk of being found guilty of child abuse if the purpose of the photography is that described in § 568.060." *Id.*

▊ Thus, prior to the amendment in 1990, the depiction of *nudity* alone, when that depiction is for the purpose of sexual stimulation or gratification, constitutes a *prohibited sexual act* subject to the penalty of the statute, whether or not the nudity is in the performance of "sexual or anal intercourse, masturbation, bestiality," or any other *prohibited sexual act* enumerated by § 568.060.2. The amendment does not change the substantive sense of *nudity,* but merely adds *fetishism* to *nudity, sexual or anal intercourse,* and the other acts criminalized as **"prohibited sexual acts"** by § 568.060.2.

▊ In assessment of the sufficiency of the submission of the offense, the court of review accepts as true all the reasonable inferences from the evidence that tends to establish guilt and disregards evidence and inferences to the contrary. *State v. Newbold,* 731 S.W.2d 373, 381 (Mo.App.1987). The evidence was sufficient to prove and submit that the nudity of the child J.R. was photographed "for the purpose of sexual stimulation or gratification of any person who may view such a depiction." § 568.-060.2.

There were the admissions by Salata in his letters that ever since childhood "I've had a strong association between messy diapers/pants and masturbation," and that "masturbation had now become a fixed part of my diaper wearing ritual." In his tape recorded letter to Chris Taylor, he told about "seeing other kids in diapers and getting an erection, even in the first [and] second grade." There was the order form from the *Diaper Pail Fraternity* newsletter that Salata completed to request a number of different stories involving wet and/or soiled diapers involving masturbation, oral sex, bondage and other subjects. There was the evidence that Salata had distributed photographs of J.R. to other

Diaper Pail Fraternity members, at least one of whom—Chetki was known to the defendant to be a coprophile and pedophile. Salata also admitted that he would represent himself in his letters to Chetki and others as having the same interests as his correspondents to make them think he was "one of them." These inferences alone, from the mass of evidence, suffices to prove *prima facie* that the nude photograph of J.R. in evidence as Exhibit 9 was taken for Salata's own sexual stimulation and gratification as well as for others. The offense was submissible and properly submitted.

▊ The next point on appeal contends that § 568.060 violates the due process clause of the United States Constitution and Article 1, § 10 of the Missouri Constitution as void for vagueness and, alternatively, that the statute violates his right to freedom of expression under the First and Fourteenth Amendments to the United States Constitution because it is overbroad and proscribes protected conduct.

If the point presents an issue of the validity of a statute in a constitutional sense, then jurisdiction properly rests in the Supreme Court of Missouri and we may not entertain the question. Art. 5, § 3, Mo. Const., (1945, amended 1976). The mere assertion of invalidity of the statute, however, does not deprive the court of appeals of jurisdiction. The question must be real and substantial, not merely colorable. *State v. Charity,* 637 S.W.2d 319, 321[2] (Mo.App.1982). "A claim of violation of a constitutional guaranty may be said to be substantial when, upon preliminary inquiry, the contention discloses a contested matter of right, involving some fair doubt and reasonable room for controversy." *Id.*

The void for vagueness contention, to the meager extent developed in the brief and argument, is simply that "the statute gives no guidance to the public or to persons engaging in such conduct as to the definition of nudity itself." The statute is impermissibly and unconstitutionally vague, the argument goes, because Salata and "others similarly situated are compelled to specu-

late as to whether a photograph is proscribed by statute." *Helgoth*, of course, addressed that question directly and gave the answer. *Nudity*, in the context of § 568.060, was implicitly given the meaning of common usage, a meaning already understood by everyone without further definition. *See, e.g., State v. Foster*, 838 S.W.2d at 68. " 'If the terms or words used in the statute are of common usage and are understandable by persons of ordinary intelligence, they satisfy the constitutional requirements as to definiteness and certainty.' " *State v. Mahurin*, 799 S.W.2d 840, 842[5] (Mo. banc 1990).

■ Salata contends also that the statute is overbroad and violates his right of free expression. The brief acknowledges that under *New York v. Ferber*, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982), child pornography is not entitled to First Amendment protection, but that conduct relates to that which "portray[s] sexual acts or lewd exhibitions of genitalia by children." *Id.* at 753, 102 S.Ct. at 3352. Thus, the argument implies, photographed nudity that does not involve sexual or lewd exhibitions of genitalia by children is entitled to First Amendment protection. The argument rests on the dissent in *Helgoth*, but slights the majority holding which governs the issue. *Helgoth* makes plain that § 568.060 relates to child abuse and not child pornography. The child abuse statute prohibits conduct, and not speech. "And even if it were assumed that the prohibited conduct contained 'speech' as well as 'nonspeech' elements, 'a sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms.' "

It is evident that these very contentions of the invalidity of § 568.060 as a matter of constitutional principle have been decided by our supreme court en banc in *Helgoth*. They do not raise original questions of the construction of this statute, but application only of a meaning already authoritatively determined, and which now binds our decision. We have jurisdiction to entertain them, and decide them against the defendant.

■ The final point argues that it was error for the trial court to submit Instruction No. 4 on the pattern of MAI–CR3d 302.04, which defines "proof beyond a reasonable doubt" as "proof that leaves you firmly convinced of the defendant's guilt." Salata cites *Cage v. Louisiana*, 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990) to support the contention that the pattern instruction dilutes the burden of proof of the prosecution in a criminal case. This argument was rejected by our supreme court in *State v. Griffin*, 818 S.W.2d 278, 282[7] (Mo. banc 1991), and again in *State v. Ervin*, 835 S.W.2d 905, 924[32] (Mo. banc 1992).

It is to be noted, moreover, that the instruction in issue in *Cage*, the definition of "reasonable doubt" was invalidated on the basis that "a reasonable juror could have interpreted the instruction to allow a finding of guilt based on a degree of proof below that required by the Due Process Clause." *Cage*, 498 U.S. at 41, 111 S.Ct. at 330. The standard of review for jury instructions employed in *Cage* how a reasonable juror could have understood the instruction was superseded in *Estelle v. McGuire*, — U.S. —, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), by "the reasonable likelihood" standard. *Id.* — U.S. at — n. 4, 112 S.Ct. at 482 n. 4. That standard, reintroduced from *Boyde v. California*, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1989), rests on the premise that the "reasonable likelihood" standard "better accommodates the concerns of finality and accuracy than does a standard which makes the inquiry dependent on how a single hypothetical 'reasonable' juror could or might have interpreted the instruction." *Boyde*, 494 U.S. at 380, 110 S.Ct. at 1198.

Accordingly, the claim here—that the definition of "beyond a reasonable doubt" in the burden of proof pattern instructions, MAI–CR3d 300.02 and 300.04, as "proof that leaves you firmly convinced of the defendant's guilt" diminished the meaning of reasonable doubt—must be reviewed under the standard of whether "there is a

reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. at 380, 110 S.Ct. at 1198. The point on appeal as stated and as argued does not suggest that inquiry on review, nor advance any other than according to *Cage*.

The instructions in this case have not been found erroneous by any court. Rather, even before *Cage*, their constitutional validity was confirmed by our supreme court en banc in *State v. Antwine*, 743 S.W.2d 51 (Mo. banc 1987), against the contention that " 'firmly convinced' lowers the burden of proof required of the State in criminal cases to something else than beyond a reasonable doubt." *Antwine* explains: "The 'firmly convinced' language contained in the MAI definition is not new. It is substantially the same as that found in the federal instructions, and has been employed in federal and state courts alike. [Citations omitted.] It is intended to assist lay jurors in their understanding of the legal phrase 'beyond a reasonable doubt.' The instruction achieves that purpose; in our view, 'firmly convinced' is essentially synonymous with 'beyond a reasonable doubt.' " *Id.* at 62[12].

This opinion does not, as such, articulate the "reasonable likelihood" standard of instruction review. It, nevertheless, confirms the absence of "reasonable likelihood" that these pattern instructions, so regularly employed in the courts to explain to jurors the legal phrase, "beyond a reasonable doubt," in terms of common understanding, "prevents the consideration of constitutionally relevant evidence," as condemned by the United State Supreme Court in *Boyde* and *Estelle*.

The point is denied.

The judgment of conviction is affirmed.

All concur.