STATE of Missouri, Respondent,

v.

Evason JACOBS, Appellant.

Evason JACOBS, Appellant,

v.

STATE of Missouri, Respondent.

Nos. WD 44401, WD 46030.

Missouri Court of Appeals,
Western District.

July 20, 1993.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Aug. 31, 1993.

Application to Transfer Denied
Oct. 26, 1993.

Susan L. Hogan, Appellate Defender, Kansas City, for appellant.

Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before KENNEDY, P.J., and BERREY and SPINDEN, JJ.

PER CURIAM.

Defendant Evason Jacobs was found guilty after trial by jury of first degree murder, section 565.020.1 RSMo 1986, and armed criminal action, section 571.015.1 RSMo 1986. He was sentenced to life imprisonment without parole on the murder count and life imprisonment on the armed criminal action count. The court ordered that the sentences be served concurrently. Evason appeals his convictions and the denial, after an evidentiary hearing, of his Rule 29.15 motion for postconviction relief.

The evidence relevant to this appeal, and in a light favorable to the verdict, is as follows. In the spring and early summer of 1989, Evason was employed by Danguard Security as a security guard. He was assigned to an office building located at 1111 Grand in Kansas City, Missouri, and worked the night shift. Donald Pierce had a law practice on the third floor of 1111 Grand. Linda Culbertson was a longtime employee of Mr. Pierce and managed the office.

Donald Pierce was shot to death in the hallway outside his office on the evening of June 7, 1989. Police responding to a report of gunshots found a hysterical Linda and Donald Pierce's body. Hearing shouts, they ran to the top floor, where they found Evason with his hands tied behind his back. When asked what happened, Evason said he had been hit from behind and did not know anything else. He was taken to the hospital and then released.

After questioning Linda all night, police called Evason and asked him to come to the station for an interview. He agreed, and arrived at 7:30 a.m. on June 8. He signed a form waiving his Miranda rights at 7:40 a.m. After speaking to detectives for an hour and a half, Evason gave two videotaped statements in which he described his role in the murder of Donald Pierce. Those statements, and testimony at Evason's trial, revealed the following series of events.

Linda approached Evason in May of 1989 and discussed the possibility of finding someone to kill Pierce. Evason talked to his friend Quincy Brown about asking Quincy's brother, who was on parole for murder, to kill Pierce. Quincy's brother declined the offer, but Quincy agreed to kill Donald Pierce. Linda gave Evason $600 to give to Quincy, and Evason gave Quincy $200 of that money. When attempts by Evason and Quincy to buy a gun were unsuccessful, they agreed that Quincy would use Evason's .12 gauge shotgun, which Evason then brought to work.

Quincy came to 1111 Grand several times in May and June of 1989 with the intention of killing Donald Pierce, but, until June 7, always backed out at the last minute. At 7:30 p.m. on June 7, 1989, Quincy came to 1111 Grand dressed in black. He entered through the back door, which Evason had left open for him. Evason took Quincy to the place where he had hidden the shotgun, and then took him to the top floor, where Evason showed him how to open the doors to make it look like there had been a burglary. Linda then came and told them that Pierce was getting ready to leave. Quincy tied up Evason, hit him on the head, and scattered the contents of his wallet, all in furtherance of their plan to make it look like a burglary.

Linda and Quincy went down to the third floor, but a few minutes later Evason came down and told Quincy that he had neglected to open the door to the roof. Quincy returned to the top floor, opened the door to the roof, and retied Evason. Quincy then returned to the third floor.

At Evason's trial Quincy testified that, after he returned to the third floor, Donald Pierce came out of his office. Quincy fired the shotgun, hitting Pierce in the shoulder. Pierce cried for Linda to help him, but she pushed Quincy toward him and told Quincy to kill him, or else they'd all go to jail. Quincy shot Pierce again, hitting him in the knee. Quincy then handed the gun to Linda and fled from the building.

Donald Pierce died of a third gunshot wound to the eye, inflicted by Linda after Quincy ran away. Linda hid the gun, which police later found in a bag with Linda's fingerprints on it. It was after the discovery of the murder weapon that Linda made a statement implicating Evason and Quincy in the murder.

While Evason made no mention of compensation in his statement, Quincy testified that Evason often talked about how he was to receive a Corvette and a job from Linda for the murder of Donald Pierce. Quincy was to receive $1,000 and a job for pulling the trigger.

Evason consented to a search of his car, where police found four $100 bills and a box of shotgun shells that matched a spent shell found at the murder scene and two live shells found in the murder weapon.

Dr. Daniel Claiborn, a psychologist, testified for the defense at trial. Dr. Claiborn interviewed Evason and performed several psychological and intelligence tests on him. Based on his observations and the results of the tests, Dr. Claiborn gave the opinion that Evason is borderline mild mentally retarded, is perceptually dysfunctional, and has a dependent personality disorder. Dr. Claiborn believes these defects prevent Evason from being able to coolly reflect and deliberate.

In his first point on appeal Evason argues that the trial court erred in allowing the introduction of Evason's statements made to police and the items found in his car. Evason asserts that he did not make a knowing, intelligent waiver of his Miranda rights.

■ Evason filed a pretrial motion to suppress the statements and evidence. After a hearing the trial court denied the motion. Dr. Claiborn testified at the suppression hearing that three different intelligence tests had been performed on Evason, and the results showed he has an IQ in the range of 63.5 to 78. Dr. Claiborn felt that Evason's actual IQ was closer to the lower scores. Evason can read at least at a second grade level, would occasionally read the newspaper, and was holding down two jobs at the time of the murder. Neither Dr. Claiborn nor the other person who administered the tests to Evason read the Miranda warnings to him in order to ascertain whether Evason understood them.

The police officers who interviewed Evason testified that there was no indication that Evason had any trouble understanding what his legal rights were. On the videotaped statement, which was admittedly taken after Evason had already been questioned by police for a few hours, Evason appears quite articulate and able to understand the questions being asked of him. He states on the tape that he had viewed the Miranda waiver, signed and understood it.

■ The state has the burden of proving that the defendant properly waived his rights. *State v. Powell*, 798 S.W.2d 709 (Mo. banc 1990), *cert. denied*, — U.S. —, 111 S.Ct. 2914, 115 L.Ed.2d 1077 (1991). We will reverse the trial court's finding that the waiver was voluntary only if such finding is completely erroneous. *Id.* Having carefully read the transcript of the suppression hearing and viewing the taped statement, we find that the trial court's determination that Evason knowingly and intelligently waived his rights was supported by substantial evidence and was not clearly erroneous.

In *State v. Powell*, the Missouri Supreme Court affirmed the conviction and death sentence of a man charged in connection with a double murder. The defendant challenged the admission of statements he made after waiving his Miranda rights. The evidence at the suppression hearing showed defendant had an IQ of between 65 and 83 and could read at the third grade level. None of the experts who examined the defendant attempted to discover whether he understood the meaning of the Miranda waiver.

"The requirement that a waiver of rights be knowing and intelligent does not mean that a defendant must know and understand all of the possible consequences of the waiver." *State v. Powell*, 798 S.W.2d at 713 (citation omitted). While Evason's decision to speak to police and to consent to a search of his car may have been very poor judgment, there is no evidence to suggest that he did not understand that he could refuse to speak to police without an attorney present. Point denied.

■ Evason next complains about the trial court's sustaining the state's motion in limine to exclude certain evidence that showed that Linda Culbertson participated in the thefts of computer equipment from Donald Pierce's law firm, paid herself four extra paychecks during 1988, had approached another security guard with the idea of killing Donald Pierce in December of 1988, and may have vandalized various cars belonging to Donald Pierce and his wife between September of 1988 and January of 1989. There was no evidence that Evason was aware of Linda's actions in these instances. The court sustained the state's objection that this evidence was irrelevant and too remote in time to the murder.

Evason argues that this evidence shows that Linda was "consistently and uniformly deceptive and manipulative of those around her." He asserts that the evidence is relevant to show that, given his dependent personality disorder, he was susceptible to manipulation by Linda and was unable to deliberate and refuse to participate in her scheme.

"The trial court has broad discretion as to the relevancy of evidence and this court will not interfere with the trial court's ruling absent a clear showing of abuse." *Lewis v. State*, 806 S.W.2d 89, 93 (Mo.App.1991) (cita-

tion omitted). If the offered evidence would divert the jury's attention from the question to be decided, it should be excluded. *Id.*

We see no abuse of discretion in the decision by the trial court to exclude the evidence of Linda Culbertson's behavior in incidents prior to, and unrelated to, the plot in May and June of 1989 to kill Donald Pierce. Evason's argument that the evidence tended to show how he was dominated by Linda is not well taken; while they may prove that Linda harbored a great deal of hostility toward Donald Pierce, it is unclear how they go to show that Linda was capable of depriving Evason of his ability to refuse to participate in the murder plot. Point denied.

■ Evason's third point challenges the pattern jury instruction on reasonable doubt. He asserts that the instruction is in conflict with *Cage v. Louisiana,* 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990). We first note that the standard of review for jury instructions used in *Cage* has been superseded by *Estelle v. McGuire,* —— U.S. ——, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). The correct test is now whether "there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *State v. Salata,* 859 S.W.2d 728, 736 (Mo.App.W.D. June 15, 1993) (quoting *Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 1197, 108 L.Ed.2d 316 (1989)). Evason does not argue that MAI–CR3d 302.04 fails to meet the burden established by *Estelle* and *Boyde.*

The Missouri Supreme Court has consistently disapproved the argument which is advanced by Evason, holding that " 'firmly convinced' is essentially synonymous with 'beyond a reasonable doubt' ". *State v. Antwine,* 743 S.W.2d 51, 62 (Mo. banc 1987), *cert. denied,* 486 U.S. 1017, 108 S.Ct. 1755, 100 L.Ed.2d 217 (1988); see also *State v. Mease,* 842 S.W.2d 98 (Mo. banc 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2363, 124 L.Ed.2d 269 (1993); *State v. Ervin,* 835 S.W.2d 905 (Mo. banc 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993). Point denied.

Evason's fourth and fifth point challenge the denial of his Rule 29.15 motion for post-conviction relief. Evason claims that he was denied effective assistance of counsel in violation of the Sixth and Fourteenth Amendments of the U.S. Constitution and Article I, Section 18(a) of the Missouri Constitution.

■ Evason presents five instances in which he claims his counsel was ineffective. We are limited in our review to determining whether the findings and conclusions of the trial court were clearly erroneous. Rule 29.-15(j); *Leisure v. State,* 828 S.W.2d 872 (Mo. banc), *cert. denied,* —— U.S. ——, 113 S.Ct. 343, 121 L.Ed.2d 259 (1992). The defendant must show not only that his attorney's performance was deficient, but that the defendant's case was prejudiced as a result of this deficiency. *Leisure,* 828 S.W.2d at 874.

■ Evason claims that his counsel was deficient in failing to challenge for cause venireperson May Ella Smith. During voir dire, when asked about the extent of her knowledge of the case from the news media, Ms. Smith stated, "Oh, murder is murder as far as I am concerned." Evason contends that this statement indicates that Ms. Smith had prejudged the question of his guilt, and was unable to consider the lesser included offenses to murder in the first degree.

A review of the above comment in the context of the entire conversation that took place during voir dire shows that Ms. Smith gave assurances that she could set aside what she had heard outside the courtroom about the murder and presume that Evason was innocent until such time as the state proved him guilty. Later during voir dire, when defense counsel asked the jury panel whether any of them would have difficulty in considering the lesser included offense of second degree murder, no one, including Ms. Smith, indicated that they would have such difficulty.

In *State v. Walton,* 796 S.W.2d 374 (Mo. banc 1990), the Missouri Supreme Court addressed the issue of when a venireperson must be excused for prejudice. The court stated,

> However, where an answer to a question suggests a possibility of bias and upon further questioning, the venireman gives unequivocal assurances of impartiality, the bare possibility of prejudice will not disqualify the juror or deprive the trial judge of discretion to seat the venireperson.

*Walton,* 796 S.W.2d at 377 (citation omitted). Ms. Smith gave unequivocal assurances of impartiality. Defense counsel did not challenge Ms. Smith for cause, nor did they attempt to use a peremptory challenge to remove her from the jury pool. These decisions were reasonable given Ms. Smith's answers to the questions put before her, and do not constitute ineffective assistance of counsel.

Evason next complains of his counsel's failure to request an instruction pursuant to MAI–CR 3d 310.06, concerning the voluntariness of a confession or admission of a defendant. MAI–CR 3d 310.06 must be given if requested by either the defense or the prosecution, and instructs the jury to disregard any statement made by the defendant if they do not believe the statement was made voluntarily, or that the defendant understood what he was saying or doing at the time he made the statement.

At Evason's postconviction hearing, one of his trial attorneys testified that she had forgotten about MAI–CR 3d 310.06 until the prosecutor asked her if she was going to request it, and was so embarrassed that she said no without giving it any thought. The attorney admitted, however, that a decision had been made to not present evidence at trial regarding the voluntariness of Evason's statement. Given the fact that the attorneys had decided, as a matter of trial strategy, not to try to prove that Evason had made his statements to the police involuntarily, there is no error in the decision, however hastily made, to not offer an instruction regarding the voluntariness of Evason's statements. *See State v. Ianniello,* 671 S.W.2d 298 (Mo. App.1984) (holding that it is not error to refuse an instruction which lacks any evidentiary support).

Evason's next contention is that his counsel was ineffective in failing to investigate and present the testimony of Robert Lange, who had worked at Donald Pierce's law firm up until a month before the murder and who could have testified to Linda Culbertson's control over the firm. According to Evason, this testimony would have eliminated the basis for the objection that the evidence of Linda's actions against Donald Pierce were too remote to be relevant.

In order to prevail on a claim of ineffective assistance of counsel for failure to call a witness a defendant must prove that, had the witness testified, the testimony would have provided the accused with a viable defense. *State v. Borders,* 844 S.W.2d 49 (Mo.App.1992). We have already discussed the fact that this type of testimony would not have provided Evason with a viable defense. The evidence was correctly excluded not only because of its remoteness, but because it has no relevance to the issue of Evason's guilt. Mr. Lange's testimony does not make the evidence any more relevant.

Evason also claims that his counsel was ineffective in refusing to allow him to testify at the suppression hearing. At the postconviction hearing, Evason's trial counsel testified that they could not remember if they even discussed with Evason whether or not he should testify, but that they would never refuse to allow a client to testify if that client insisted on doing so. They also stated that, had Evason wished to testify at the hearing, they would have strongly advised against it, because they believed his testimony would hurt more than it would help.

We do not reach the merits of this issue, because Evason failed to preserve it for review. Evason's pro se and amended postconviction motions alleged that his counsel was ineffective by refusing to allow him to testify at trial. On the date of the hearing, the court was informed that Evason actually wished to complain about counsel's refusal to allow him to testify at the pretrial suppression hearing. The court erroneously allowed Evason to present evidence on this new issue.

Evason waived his right to complain about not testifying at the suppression hearing by failing to present the issue in either of his 29.15 motions. Issues can not be tried by consent of the parties in Rule 29.15 hearings. *State v. Perry,* 820 S.W.2d 570, 575 (Mo.App. 1991). An appellate court will only consider those issues raised in the original *pro se* motion or in the amended motion. *State v. Ervin,* 835 S.W.2d at 929.

Evason's last allegation of ineffective assistance of counsel concerns defense

counsel's failure to preserve in a motion for new trial the objection to the exclusion of venireperson Michael Burr. Mr. Burr is confined to a wheelchair, and the judge excused him because of the hardship his service would create given the lack of facilities in the courthouse to accommodate handicapped jurors. Claims of undue hardship by venirepersons wishing to avoid jury service are to be considered by the judge on a case-by-case basis. *State v. Leisure,* 838 S.W.2d 49, 56 (Mo.App.1992). During voir dire, Mr. Burr stated that he needed help getting personal items and, while sequestered, would need help getting in and out of his chair. The courtroom was not built to accommodate wheelchairs, and there was no ramp to the courtroom. Given these difficulties, we defer to the trial court's decision to excuse Mr. Burr on grounds of hardship. Since the trial court did not err, the failure to preserve this issue for review does not constitute ineffective assistance of counsel. *Beck v. State,* 792 S.W.2d 63 (Mo.App.1990). Points four and five are denied.

Judgment affirmed.

All concur.